UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SHERRY ZOE CORBEIL,

                Plaintiff,

v.                                                 **DECISION AND ORDER**

                                                 17-CV-01321

ANDREW M. SAUL,
COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____

        This is an action brought pursuant to 42 U.S.C. §§405(g) and 1383(c)(3) to review the final determination of defendant Andrew M. Saul, the Commissioner of Social Security,[1] that plaintiff was not entitled to Social Security benefits. The parties have consented to the jurisdiction of a Magistrate Judge [10].[2] Before me are the parties' cross-motions for judgment on the pleadings [12, 15]. Having reviewed the parties' submissions [12, 15, 18], I order that this case be remanded to the Commissioner for further proceedings.

**BACKGROUND**

        Plaintiff applied for Social Security Supplemental Security Income ("SSI") benefits alleging an onset date of June 30, 2001 (R. 121-122)[3]. She asserts that her disability is

---

[1]     *See* <u>Reddinger v. Saul</u>, 2019 WL 2511379, *9 n. 1 (D. Conn. 2019) ("on June 17, 2019, Andrew M. Saul became the Commissioner of Social Security. Because Carolyn Colvin was sued in this action only in her official capacity, Andrew M. Saul is automatically substituted for Carolyn Colvin as the named defendant. See Fed. R. Civ. 25(d). The Clerk of the Court shall amend the caption in this case as indicated above").

[2]     Bracketed references are to the CM/ECF docket entries.

[3]     References denoted as "R." are to the administrative record [9]. Unless otherwise indicated, page references are to numbers located on the bottom of the document pages.

due to psychosis, depression, anxiety, lower back pain, dizziness, memory difficulties (R. 147). After plaintiff's claims were initially denied, an administrative hearing was held on February 7, 2011 before Administrative Law Judge ("ALJ") William Weir (R. 31). ALJ Weir issued a decision denying benefits on May 25, 2011 (R. 13). The Appeals Council denied plaintiff's request for review, and plaintiff thereafter commenced a prior federal court action which resulted in a Decision and Order issued by Hon. Michael A. Telesca, dated April 16, 2015, remanding the case for further administrative proceedings (R. 587-606). On October 5, 2015, the Appeals Council vacated ALJ Weir's 2011 decision and directed further administrative proceedings consistent with Judge Telesca's Decision (R. 607). ALJ Weir conducted a second administrative hearing on April 21, 2017 (R. 511), and on October 5, 2017 issued another decision denying plaintiff's claim for benefits (R. 488). That decision became the final decision of the Commissioner by operation of 42 U.S.C. §§405(g) and 1383(c)(3). [15-1], p. 2. The plaintiff initiated this appeal.

Plaintiff has a long history of psychiatric treatment. Records from her admission to Erie County Medical Center ("ECMC") on January 4, 2002 state that by that date plaintiff had "a history of chronic depression but no treatment until June 2001 when she was hospitalized at Lakeshore Hospital", apparently for and attempted overdose (R. 289). Although the nature and circumstances regarding her 2001 hospitalization are uncertain as reports from that admission are not in the record, it appears that she was placed on Celexa at that time. Id. She was admitted again in January 2002, again after another attempted suicide by taking an overdose of aspirin. Id. Upon admission, plaintiff was said to be "extremely tense, anxious, preoccupied and depressed". Id. Her speech was rational but unproductive. Id. She was restarted on Celexa. Id.

On June 30, 2004, she was sent to the emergency room at Buffalo General Hospital ("BGH") after speaking with crisis services (R. 461). She was depressed, nervous and jittery. Id. Upon examination, she was determined to be very anxious, depressed, and experiencing paranoia (R. 463). Plaintiff stated that she had a hard time focusing and thinking clearly, which according to the intake notes, was "evident during [the] interview". Id. It appears that upon discharge plaintiff was to continue with Celexa and Klonopin, however, the hospital note suggests that plaintiff "can't remember meds" (R. 461).

During a visit to her primary physician's office on June 12, 2008, plaintiff appeared "poorly groomed, disheveled and frail" (R. 255). Physician's Assistant ("PA") Jamie Conklin instructed plaintiff's mother to immediately take her to the hospital for psychiatric evaluation (R. 255). Plaintiff was taken to BGH and hospitalized on an emergency basis from June 12, 2008 to June 17, 2008 due to "increasing confusion and agitation along with auditory hallucinations" (R. 215). Her state, which was said to be "highly agitated", required her to be sedated. Id. Plaintiff reported that she began to hear "voices" approximately a month earlier. Id. During the hospital stay, plaintiff was "found to be reasonably cooperative, but she was mildly perplexed and sometimes appeared to be distracted. It was necessary to redirect her attention". Id. Plaintiff's auditory hallucinations were found to be "highly disturbing and affecting her concentration and her attention span". Id. Risperdal was added to her medication regimen and she was discharged to continue through outpatient counseling. Id. She was diagnosed as suffering from major depression, recurrent with psychotic features. Id. A report from plaintiff's primary physician's office dated October 2, 2008 states that plaintiff continued to feel confused and was unable "to follow [the] story line in [a] movie" (R. 264).

On November 5, 2016, plaintiff was seen at Kenmore Mercy Hospital emergency room due to anxiety, possible delusions, and forgetfulness (R. 826). The hospital records suggest plaintiff had experienced similar episodes in the past. Id. It was noted that she had seen her psychiatrist during the week but was "vague on details of visit". Id. It was also noted that she has had difficulty at times with her husband and family interactions. Id. She was diagnosed as suffering from "adjustment disorder with mixed anxiety and depression, hyponatremia[4]", and instructed to follow up with her psychiatrist, Dr. Alfred Belen (R. 825).

In addition to her various hospital visits, the record reflects that since 2008 plaintiff has received outpatient treatment with a psychiatrist and a counselor. In 2008, plaintiff was being treated at the Boulevard Mental Health affiliated with Horizon Corporations (R. 803). On June 30, 2008 she was found to exhibit a "religious preoccupation" and was still experiencing auditory hallucinations. Id. At that time, she was also being followed by Dr. Belito Arana, a psychiatrist (R. 804). In a report dated November 4, 2008, he described plaintiff's auditory hallucinations as "the voice of a man, especially at night when she was trying to sleep, and his voice was constantly telling her derogatory things and also giving her commands to kill herself". Id. As things worsened, plaintiff began hearing daytime auditory hallucinations "in the form of children's voices telling her 'it's all over'". Id. He also noted that plaintiff had also had visual hallucinations "of dark, geometrical figures". Id. Upon examination, he stated that although plaintiff's hallucinations had decreased, she still reported occasional auditory hallucinations of "faint voices calling her name". Id. He stated that her cognitive function was impaired and that

---

[4] Hyponatremia is a "condition that occurs when the level of sodium in your blood is abnormally low". Wheatley v. Colvin, 2017 WL 2313880, *4 (S.D. Fla. 2017) citing *Hyponatremia,* Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/hyponatremia/basics/definition/con-20031445.

he she had "slight psychomotor retardation". Id. He also found that "her concentration appears to be somewhat impaired based on her difficulty in understanding some of the questions". Id. He diagnosed her as suffering from major depressive disorder, recurrent, with psychotic features in partial remission. Id.

On June 17, 2009, plaintiff submitted to a consultative physical examination by Dr. Samuel Balderman, at the request of the Commissioner (R. 405). The examination results were unremarkable, however, Dr. Balderman did diagnose plaintiff as suffering from depression and a learning disability (R. 407).

While at Horizon, plaintiff began treatment with Dr. Richard Wolin. On May 19, 2009, Dr. Wolin completed a "Medical Assessment Of Ability To Do Work Related Activities" with respect to plaintiff's mental capacity (R. 283). He found that she would have a "poor"[5] ability to follow work rules, relate to coworkers, deal with the public, use judgment, interact with supervisor, and maintain attention/concentration. Id. Dr. Wolin stated that plaintiff would have no ability to deal with work stress or functioning independently. Id. He noted that plaintiff had difficulty with short-term memory and focus (id.), and that she would have no ability to understand remember and carry out complex job instructions (R. 284). Plaintiff's ability to understand, remember and carry out detailed, but not complex job instructions, as well as simple job instructions, was also found to be "poor". Id. Dr. Wolin opined that plaintiff's ability to function would "significantly deteriorate were he/she to return to any type of employment", and concluded that plaintiff was "disabled from full-time competitive employment". Id.

---

5    According to the form, "poor" was defined as a "low level of functioning in this area [which] will frequently significantly impair and/or include performance of even simple work tasks". Id.

On March 2, 2010, a report from Horizon stated that plaintiff was "still hearing voices call her" but the frequency had subsided (R. 447). On April 27, 2010, Dr. Wolin reported that although plaintiff had experienced auditory hallucinations over the 2009-2010 winter months, she was "quite stable" (R. 445). At that time, he assessed her Global Assessment of Functioning ("GAF") at 50. Id.[6] On June 28, 2010, plaintiff reported that her auditory hallucinations had decreased to once a week, but noted that the voice was "a young child" who "does not make her feel fearful" (R. 475). By August 17, 2010, plaintiff reported that the auditory hallucinations and depression had "largely obviated" (R. 473). Dr. Wolin reported that in December 2010 plaintiff occasionally had "very transient auditory hallucinations" (R. 715). He summarized notes from her counselor as stating that plaintiff was "slightly pressured and [her] mood was slightly elevated", but that she was stable and did not express "lethality". Id.

On August 7, 2012, Dr. Wolin reported that plaintiff's auditory hallucinations had returned (R. 727). Subsequently, she improved somewhat and reported that her hallucinations were "almost completely remitted" on September 18, 2012 (R. 731). On December 23, 2013, Dr. Wolin stated that he was "concerned about how the [plaintiff] is dealing with things" (R. 742). He stated that, as he had indicated in his note dated November 4, 2013, the plaintiff "appears detached, emotionally exhausted, and indicates that she gets restricted support from her husband who is an alcoholic". Id. He stated that he believes "there has been an increase in the severity of her depression. Her behavior is more isolated and detached although she denies overt lethality". Id. He stated that "[t]here is also a quality of depression here which is of great concern" and he

---

[6] The GAF scale found in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-4"), published by the American Psychiatric Association, states that a GAF score between 41 and 50 reflects "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). DSM-4, p. 34.

encouraged her to have more frequent counseling sessions (R. 744). However, due to insurance issues, plaintiff stopped treating with Dr. Wolin and Horizon in 2014 (R. 865).

A report from her primary physician's office on July 21, 2014 states that plaintiff "has trouble with focus and concentration, i.e. filling out forms" (R. 763). In 2015, plaintiff continued her treatment with Dr. Belen at the Dent Neurologic Institute (R. 766). She continued to report depression and difficulty concentrating (R. 705, 766, 774, 782), but her hallucinations appear to have remained remitted in 2015. However, her visual hallucinations returned in 2016 according to Dr. Belen's November 17, 2016 report (R. 820). Dr. Belen diagnosed plaintiff as suffering from mood disorder, rule out psychosis; anxiety disorder; and paranoia (R. 775, 784, 822, 837, 846, 849, 854, 857).

On August 18, 2016, Dr. Belen completed an "Ability To Do Work-Related Activities (Mental)" assessment (R. 799). He opined that plaintiff would have a marked[7] restriction in her ability to understand and remember simple instructions, carry out simple instructions, make judgments on simple work-related decisions, understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related instructions. Id. He also found that plaintiff would have a marked restriction in her ability to interact appropriately with the public, supervisors, and coworkers, or to respond appropriately to usual work situations into changes in the routine work setting (R. 800). Dr. Belen stated that plaintiff's ability to interpret reality was affected by possible paranoia. Id.

On May 1, 2017, Dr. Belen completed a "Mental Health Treating Medical Source Statement" indicating that he had been treating plaintiff since March 3, 2015 (R. 871). He identified plaintiff's symptoms as including: anhedonia, difficulty thinking or concentrating,

---

[7]    "Marked is defined as a "serious limitation in this area. There is a substantial loss in the ability to effectively function". Id.

paranoid thinking or inappropriate suspiciousness, illogical thinking (R. 872). He opined that plaintiff would have a "poor"[8] ability to follow work rules, relate to coworkers, deal with the public, use judgment, interact with supervisor, deal with work stress, function independently, maintain attention/concentration (R. 873). He also stated that plaintiff would have a poor ability to understand, remember and carry out complex, detailed, and simple job instructions (R. 874). Dr. Belen opined that plaintiff would have a poor ability to maintain personal appearance, behavior in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. Id. He stated that plaintiff's ability to function would significantly deteriorate if she were to return to a full-time employment. Id. He assessed that plaintiff would be able to satisfactorily perform work tasks less than 75% of the time (id.), and would miss more than four days of work per month (R. 875).

## DISCUSSION

**A. Standard of Review**

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error". Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (*quoting* 42 U.S.C. §405(g)). Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion". Consolidated Edison Co. of New York. Inc. v. NLRB, 305 U.S. 197, 229 (1938).

An adjudicator determining a claim for Social Security benefits employs a five-step sequential process. Shaw, 221 F.3d at 132; 20 C.F.R. §§404.1520, 416.920. The plaintiff

---

[8] "Poor" is defined as "[l]ow level of functioning in this area will frequently (between 1/3 and 2/3 of the workday) significantly impair and/or preclude performance of even simple work tasks" (R. 873)

bears the burden with respect to steps one through four, while the Commissioner has the burden at step five. Talavera v. Astrue, 697 F.3d 145, 151 (2d. Cir. 2012).

B.     **Is the ALJ's Mental RFC supported by substantial evidence?**

After the second administrative hearing, ALJ Weir determined plaintiff's depressive disorder and anxiety disorder each constituted a severe impairment (R. 491). Nevertheless, he determined that plaintiff has the residual functional capacity to perform a full range of work at all exertional levels (R. 495). He stated that plaintiff is "able to perform simple, repetitive one or two-step tasks, but she is unable to engage in complex work, defined as work with multiple or simultaneous goals or instructions, or work that requires the claimant to discern the quality and quantity of production independently". Id. Further, he found that plaintiff is "able to tolerate no more than one change in the workplace setting per eight-hour workday, and she is occasionally able to interact with supervisors and the public". Id.

In support of this determination, ALJ Weir gave "significant weight" (R. 499) to the November 6, 2008 consultative psychiatric evaluation by Dr. Thomas Ryan (R. 224) and the June 17, 2009 consultative psychiatric evaluation by Dr. Rachel Hill (R. 410), as well as the November 25, 2008 and October 8, 2009 reports from non-examining state agency physicians Dr. M. Totin and Dr. D. Mangold, respectively (R. 230, 420).

Plaintiff argues that ALJ Weir erred by improperly relying upon the stale opinions of examining and non-examining consultative physicians, and rejecting the opinions of plaintiff's treating psychiatrists. [12-1], p. 18. The opinion of a treating physician is entitled to controlling weight so long as it is consistent with the other substantial evidence. Halloran v. Barnhart, 362 F.3d 28, 32 (2nd Cir. 2004) (*per curiam*); 20 C.F.R. §404.1527(c)(2). When an ALJ discredits

the opinion of a treating physician, the regulations direct the ALJ to "always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion". 20 C.F.R. §404.1527(c)(2); Snell, 177 F.3d at 134.

The ALJ first must consider: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other significant factors. Halloran, 362 F.3d 28, 32; *see also* 20 C.F.R. §§404.1527(c)(2)-(6). The Second Circuit has advised that the courts should not "hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion". Halloran, 362 F.3d at 33.

Generally, "the ALJ cannot rely solely on [the] RFCs [of the consulting examiners] as evidence contradicting the treating physician RFC. This is because an inconsistency with a consultative examiner is not sufficient, on its own, to reject the opinion of the treating physician". Cabibi v. Colvin, 50 F. Supp. 3d 213, 234 (E.D.N.Y. 2014). Indeed, "[t]he Second Circuit has repeatedly stated that when there are conflicting opinions between the treating and consulting sources, the 'consulting physician's opinions or report should be given limited weight'". Harris v. Astrue, 2009 WL 2386039, *14 (E.D.N.Y. 2009) (quoting Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir.1990)). "This is because 'consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day'". Cruz, 912 F.2d at 13.

Where, as here, mental health treatment is at issue, the opinions of treating professionals take on added importance. A mental health patient may have good days and bad

days; she may respond to different stressors that are not always active. Thus, the longitudinal relationship between a mental health patient and her treating physician provides the physician with a rich and nuanced understanding of the patient's health that cannot be readily achieved by a single consultative examination. *See* Canales v. Commissioner of Social Security, 698 F.Supp.2d 335, 342 (E.D.N.Y.2010) ("Because mental disabilities are difficult to diagnose without subjective, in-person examination, the treating physician rule is particularly important in the context of mental health") (*citing* Richardson v. Astrue, 2009 WL 4793994, *7 (S.D.N.Y. 2009)). Indeed, the Second Circuit recently held that "ALJ's should not rely heavily on the findings of a consultative physician after a single examination", finding that "[t]his concern is even more pronounced in the context of mental illness where, as discussed above, a one-time snapshot of a claimant's status may not be indicative of her longitudinal mental health". Estrella v. Berryhill, 2019 WL 2273574, *5 (2d Cir. 2019).

Here, ALJ Weir erred in relying upon the consulting and non-examining physicians. In addition to the fact that they were rendered without the benefit of a longitudinal relationship with the plaintiff, the opinions of the examining consultative physicians, Dr. Ryan and Dr. Hill, are internally compromised. Although both find plaintiff can perform simple tasks (R. 226, 413), both reports are equivocal, finding that plaintiff's psychiatric problems interfere with her ability to function on a daily basis (R. 226, 414), which suggests that plaintiff may be unable to sustain full-time work activity in a competitive work setting.

Dr. Ryan also found that plaintiff would have a "moderate limitation" dealing with stress (R. 226). Similarly, Dr. Hill stated that plaintiff does not deal "very well with stress" (R. 413). ALJ Weir was required to do more than merely limit her RFC to simple work. "Because stress is 'highly individualized,' mentally impaired individuals 'may have difficulty

meeting the requirements of even so-called 'low-stress' jobs,' and the Commissioner must therefore make specific findings about the nature of a claimant's stress, the circumstances that trigger it, and how those factors affect his ability to work". Booker v. Colvin, 2015 WL 4603958, *3 (W.D.N.Y. 2015). *See, e.g.*, Cooley v. Berryhill, 2017 WL 3236446, *12 (W.D.N.Y. 2017) (remanding where the ALJ did not expressly discuss the plaintiff's ability to deal with stress and finding that "[t]he RFC assessment, including limiting Plaintiff to 'simple, routine, repetitive tasks; no interaction with the public; occasional interaction with supervisors and coworkers,' neither addresses nor expressly accounts for Plaintiff's specific stress limitations").

Because they rely upon the opinions of Dr. Ryan and Dr. Hill, the non-examining opinions of Dr. Totin (R. 230) and Dr. Mangold (R. 432) are also compromised. In any event, all four consultative opinions were rendered in 2008 or 2009, meaning that these physicians were not able to consider the severity of plaintiff's impairment in the context of the whole record. Therefore, reliance upon these opinions cannot constitute substantial evidence. *See* Stackhouse v. Colvin, 52 F. Supp. 3d 518, 521 (W.D.N.Y. 2014) ("[b]ecause Dr. Altmansberger's opinion was itself based upon an incomplete and insufficient record, the ALJ's decision cannot be said to rest upon substantial evidence").

ALJ Weir also failed to provide good reasons to reject the opinions of Dr. Wolin and Dr. Belen. He discounted the opinions of Dr. Belen and Dr. Wolin because they were purportedly internally inconsistent (R. 500), but he failed to identify any specific inconsistency. He also pointed to various GAF scores (id.) as being inconsistent with the treating physicians' respective RFC assessments. Id. It is well settled that GAF scores represent only a snapshot of an individual's capacity (D.L.K. by Brink v. Commissioner of Social Security, 2017 WL 1843277, *5 (N.D.N.Y. 2017) ("GAF scores are non-dispositive and provide only a snapshot of

estimated functioning at the time")), and need not even be discussed in light of the more specific assessments included in the treating physicians' respective reports. *See* Van Gilder v. Colvin, 2013 WL 1891345, *9 (W.D. Pa. 2013), adopted 2013 WL 1891350 (W.D. Pa. 2013) ("[t]he ALJ had no reason to discuss the GAF ratings assigned to [plaintiff] by Dr. Francis, Dr. Meyer and Dr. Uran, since those ratings were overshadowed by more specific assessments describing [plaintiff's] work-related capabilities and restrictions"). In Estrella, the Second Circuit reiterated that it is not proper to discount a treating physician's opinion based upon GAF scores "unsupported by [the physician's] other conclusions as to the severity of [plaintiff's mental impairment]". Estrella, 2019 WL 2273574 at *5.

While the RFC evaluations do not include lengthy recitations of clinical findings by the treating psychiatrists, they do include some reference to clinical findings and provide a more specific evaluation of plaintiff's abilities than that provided by a GAF score. Dr. Wolin noted that his assessment was based, at least in part, upon plaintiff's difficulty with short term memory and focus (R. 283), and Dr. Belen identified a number of plaintiff's symptoms (anhedonia, difficulty thinking and concentrating, paranoia, illogical thinking) (R. 872), in addition to stating that his opinion was based upon a review of his patient's records (R. 875). It should also be noted that although they were issued by two separate, unaffiliated psychiatrists, at least seven years apart from each other, the opinions of Dr. Wolin and Dr. Belen are remarkably consistent. Moreover, as discussed above, the progress notes relating to plaintiff's long-term treatment document plaintiff's recurrent depression, anxiety and psychoses, include findings which would support to these opinions (See *e.g.* R. 447, 715, 742, 763, 804, 820).

Lastly, ALJ Weir rejects the opinions of Dr. Wolin and Dr. Belen as being inconsistent with the opinions stated by the various consulting physicians (R. 500). Initially, this

fails to heed the Second Circuit's instructions in Cruz and Estrella, which recognizes the inherent inferiority of a consultative opinion compared to the more informed opinion of a treating physician who has a longitudinal relationship with the plaintiff. In any event, as discuss above, the opinions of Dr. Ryan, Dr. Hill, Dr. Totin and Dr. Mangold were internally compromised and based upon an incomplete review of the record. As such, these consulting opinions do not constitute good reasons to discount opinions of plaintiff's treating physicians.

In light of the above, ALJ Weir's RFC is not supported by substantial evidence and this matter is remanded for further administrative proceedings,

## CONCLUSION

For these reasons, Plaintiff's motion for judgment on the pleadings [12] is granted to the extent that this case is remanded for further proceedings, consistent with the issues discussed above, and the Commissioner's motion for judgment on the pleadings [15] is denied.

Dated: June 25, 2019

    /s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge